437 A.2d 394

**Nancy D. CARROLL, Administratrix of the Estate of Craig S. Breeswine, Petitioner-Plaintiff,**

v.

**The COUNTY OF YORK, Respondent-Defendant.**

Supreme Court of Pennsylvania.

Argued March 2, 1981.

Reargued Sept. 17, 1981.

Decided Nov. 6, 1981.

Reargument Denied Dec. 14, 1981.

364

Charles E. Evans, Sikov & Love, Pittsburgh, for petitioner-plaintiff.

Lee C. Swartz, Harrisburg, for amicus curiae Pa. Trial Lawyers Assn.

Lewis H. Markowitz, Marc G. Tarlow, York, Leroy Zimmerman, Atty. Gen., for York County.

Marvin A. Fein, Associate City Sol., City of Pittsburgh, Pittsburgh, for intervenor.

Thomas L. Wenger, Wix, Wenger & Weidner, Harrisburg, for Pa. League of Cities, Pa. Municipal Authorities Ass'n, Pa. School Boards Ass'n, Pa. State Ass'n of Boroughs, Pa. State Ass'n of Tp. Com'rs, Pa. State Ass'n of Tp. Sup'rs, Pa. State Ass'n of County Com'rs, amicus curiae.

Alan J. Davis, City Sol., Judith N. Dean, Deputy City Sol., T. Michael Mather, Philadelphia, for City of Philadelphia, amicus curiae.

Before O'BRIEN, C. J. and ROBERTS, NIX, LARSEN, FLAHERTY, KAUFFMAN and WILKINSON, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

At issue on this appeal is the constitutionality of the Political Subdivision Tort Claims Act[1] enacted five years after this Court abrogated the judicially created doctrine of governmental immunity. See *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877 (1973). With the exception of eight areas of activity, not including the activity giving rise to the present action, the Act reinstates the immunity of political subdivisions from suit.[2]

Plaintiff Nancy D. Carroll filed wrongful death and survival claims in the Court of Common Pleas of York County seeking to recover for the death of her son, Craig S. Breeswine. Decedent committed suicide on February 14, 1979 while in the custody of the York County Detention Home. Plaintiff alleges that Detention Home officials negligently contributed to the death of decedent by placing him in an isolated, inadequately supervised area, even though they knew of decedent's depressed emotional condition and his previous suicide attempt at the Detention Center. Defend-

1. Act of November 26, 1978, § 101 et seq., formerly 53 P.S. § 5311.101 et seq. (Supp.1981), presently 42 Pa.C.S. § 8541 et seq.

2. For the eight exceptions to immunity, see 42 Pa.C.S. § 8542(b).

ant, County of York, filed preliminary objections to the complaint, asserting immunity from suit under the provisions of the Political Subdivision Tort Claims Act. Plaintiff responded by challenging the constitutionality of the Act. Before the trial court entered a determination, plaintiff petitioned this Court for the assumption of plenary jurisdiction. We granted the petition.[3] See 42 Pa.C.S. § 726.

■ Because we conclude that plaintiff's challenges to the constitutionality of the Act are without merit, we sustain the defendant's preliminary objections and dismiss plaintiff's complaint.

The first sentence of Article I, Section 11 of the Pennsylvania Constitution provides:

"All courts shall be open, and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

Plaintiff relies on this first sentence to argue that, by prohibiting a tort victim from successfully suing the Commonwealth, the Act unconstitutionally "closes" the courts to potential plaintiffs by denying them a "remedy by due course of law."

Plaintiff's argument, based solely on the first sentence of Article I, Section 11, completely ignores the concluding sentence of that section:

"Suits may be brought against the Commonwealth in such manner and in such cases as the Legislature may by law direct."

This concluding sentence of Article I, Section 11 is an integral, unequivocal and controlling portion of the Constitutional provision upon which plaintiff would rely.

In 1978, this Court discussed the relationship between Article I, Section 11 and the doctrine of sovereign immunity:

---

**3.** This Court heard oral argument on March 2, 1981. On June 30, 1981, this Court sua sponte entered an order for reargument. Reargument was heard on September 17, 1981.

"[W]e now believe that this constitutional provision does not forbid judicial abrogation of the doctrine. Rather, 'The Constitution is . . . neutral—it neither requires nor prohibits sovereign immunity.' It merely provides that the presence or absence of sovereign immunity shall be decided in a non-constitutional manner . . . ."

*Mayle v. Pennsylvania Dep't of Highways*, 479 Pa. 384, 400, 388 A.2d 709, 716 (1978). Thus, while the Framers of Article I, Section 11 did not intend to grant constitutional immunity to the Commonwealth, they

"intended to allow the Legislature if it desired, to choose cases in which the Commonwealth should be immune . . . ."

479 Pa. at 400, 388 A.2d at 717. Surely the Legislature's authority "to choose cases in which the Commonwealth should be immune" encompasses political subdivisions. It is axiomatic that

" '[m]unicipal corporations are agents of the state, invested with certain subordinate governmental functions for reasons of convenience and public policy. They are created, governed, and the extent of their powers determined by the Legislature and subject to change, repeal or total abolition at its will.' "

*City of Pittsburgh v. Commonwealth of Pennsylvania*, 468 Pa. 174, 179, 360 A.2d 607, 610 (1976), quoting *Commonwealth v. Moir*, 199 Pa. 534, 541, 49 A. 351, 352 (1901). Consistent with *Mayle*, the conferring of tort immunity upon political subdivisions is within the scope of the Legislature's authority pursuant to Article I, Section 11.

Nonetheless, plaintiff maintains that the Political Subdivision Tort Claims Act creates arbitrary and irrational classifications. Plaintiff seizes upon language in *Ayala*, supra, where this Court stated:

"We conclude that no reasons whatsoever exist for continuing to adhere to the doctrine of governmental immunity. Whatever may have been the basis for the inception of the

doctrine, it is clear that no public policy considerations presently justify its retention."

453 Pa. at 592, 305 A.2d at 881.

Plaintiff's reliance on *Ayala* is misplaced. This Court has repeatedly emphasized the fundamental distinction between the abrogation of a judicially created doctrine, as in *Ayala*, and the review, as here, of an act of the Legislature. As this Court stated in *Ayala*,

> "the doctrine of governmental immunity—judicially imposed—may be judicially dismantled. . . . : the controverted rule . . . is not the creature of the Legislature. *This Court fashioned it, and, what it put together, it can dismantle.*"

453 Pa. at 600, 305 A.2d at 885, quoting *Flagiello v. Pennsylvania Hospital*, 417 Pa. 486, 503, 208 A.2d 193, 202 (1965) (emphasis added in *Ayala*). So too, in *Hack v. Hack*, 495 Pa. 300, 433 A.2d 859 (1981), where this Court recently abrogated interspousal immunity, the primary issue was whether the Legislature had intended to create the immunity. There was no serious question that, absent a controlling statute, this Court could and should abrogate the doctrine.

This Court has frequently recognized that the Legislature may permissibly limit liability on the basis of a defendant's status. For example, in *Sherwood v. Elgart*, 383 Pa. 110, 117 A.2d 899 (1955), this Court found no violation of Article I, Section 11, where a statute denied a remedy in tort to all victims of negligent trespass to personal property which occurred while the property was in the care of an innkeeper even though the same negligent trespass by an owner of an apartment house or an apartment building would have given rise to liability. So too, in *Freezer Storage, Inc. v. Armstrong Cork Co.*, 476 Pa. 270, 382 A.2d 715 (1978), our Court found no constitutional violation where the Legislature had provided that tort liability of architects and builders would terminate twelve years after completion of a structure despite the fact that others not engaged in the improvement of real estate, such as suppliers of property, were not made similarly immune.

"This Court would encroach upon the Legislature's ability to guide the development of the law if we invalidated legislation simply because the rule enacted by the Legislature rejects some cause of action currently preferred by the courts. To do so would be to place certain rules of the 'common law' and certain non-constitutional decisions of courts above all change except by constitutional amendment. Such a result would offend our notion of the checks and balances between the various branches of government, and of the flexibility required for the healthy growth of the law."

476 Pa. at 281, 382 A.2d at 721. See also *Tsarnas v. Jones & Laughlin Steel Corp.*, 488 Pa. 513, 412 A.2d 1094 (1980); *Singer v. Sheppard*, 464 Pa. 387, 346 A.2d 897 (1975); *Jackman v. Rosenbaum Co.*, 263 Pa. 158, 106 A. 238 (1919), aff'd, 260 U.S. 22, 43 S.Ct. 9, 67 L.Ed. 107 (1922).

■ It is not our function to displace a rationally based legislative judgment.

"Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others."

*Williamson v. Lee Optical Co.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563, 573 (1955) (citations omitted). See *Dandridge v. Williams*, 397 U.S. 471, 486–87, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491, 502–03 (1970); *Springfield School District v. Department of Education*, 483 Pa. 539, 397 A.2d 1154 (1979).

The Report of the Joint State Government Commission on Sovereign Immunity, which formed the basis for the Political Subdivision Tort Claims Act, explains that partial immunity will assure

"that the Commonwealth will not be required to process and defend various litigation brought against it in areas where risk management is totally uncertain at this time . . . ."

May, 1978 Report at 10. Manifestly, it is within the province of the Legislature to determine that certain bars to suit are, in its judgment, needed for the operation of local government.[4]

Contrary to plaintiff's assertions, the Political Subdivision Tort Claims Act is a valid exercise of legislative authority specifically granted by our Constitution. Accordingly, defendant's preliminary objections are sustained and plaintiff's complaint dismissed.

LARSEN, J., files a dissenting opinion in which FLAHERTY and KAUFFMAN, JJ., join.

KAUFFMAN, J., filed a dissenting opinion in which LARSEN and FLAHERTY, JJ., join.

LARSEN, Justice, dissenting.

I dissent. In 1973, this Court buried the "doctrine" of governmental immunity, as that "doctrine" had long since been deprived of any vitality which it might once have enjoyed. *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877 (1973). There, Justice Roberts described the decay of justice that had taken place in this area as stare decisis had advanced *into rigor mortis*. With the Political Subdivision Tort Claims Act of 1978, 53 P.S. §§ 5301.101–5301.803 (supp. 1980–81) (the Act), the legislature now with the help of the majority, summons the corpse from its grave.

Petitioner's challenges are: 1) Section 201 of the Act, which grants immunity from tort liability to political subdivisions, closes the courts to one who has suffered injury in violation of Article I, § 11 of the Pennsylvania Constitution; 2) the classifications created by sections 201 and 202 of the Act are impermissible under the Equal Protection Clause of

4. Plaintiff also challenges the constitutionality of the Political Subdivision Tort Claims Act because it limits awards recoverable by claimants to $500,000 for each tort. However, because plaintiff is not among those who can recover under any one of the eight exceptions to governmental immunity enumerated in the Act, the issue is not properly before this Court.

the Fourteenth Amendment to the United States Constitution; and 3) Sections 402, 403 and 405 of Chapter 4 of the Act, "Limitations on Damages", limit the amount of recovery for an injury in violation of Article III, § 18 of the Pennsylvania Constitution.

As with all challenges to the constitutionality of lawfully-enacted legislation, we must begin with the presumption in favor of constitutionality. The burden is on the challenger to rebut the presumption by demonstrating that the legislation "clearly, palpably and plainly" violates some constitutional directive. *Milk Control Commission v. Battista*, 413 Pa. 652, 659, 198 A.2d 840, 843 (1964); *Daly v. Hemphill*, 411 Pa. 263, 271, 191 A.2d 835, 840 (1963); *Singer v. Sheppard*, 464 Pa. 387, 393, 346 A.2d 897 (1975). I would find that petitioner has met her burden.

Article I, § 11 of the Pennsylvania Constitution declares, in *relevant* part:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay.

Petitioner contends that section 201 of the Act, 53 P.S. § 5311.201, violates this provision. Section 201 provides that, except for eight exceptions listed in section 202,[1] "no political subdivision shall be liable for any damages on account of any injury to a person or property caused by any act or omission of the political subdivision or an employee thereof or any other person."[2] Petitioner's cause of action

1. This section waives immunity in eight specific areas, to-wit:
   (1) Vehicle Liability;
   (2) Care, custody or control of personal property;
   (3) Care, custody or control of real property;
   (4) Dangerous conditions of trees, traffic controls and street lighting;
   (5) Dangerous conditions of utility service facilities;
   (6) Dangerous conditions of streets;
   (7) Dangerous conditions of sidewalks;
   (8) Care, custody or control of animals.

2. "Political Subdivision" is very broadly defined in section 102, 53 P.S. § 5311.102.

does not fall within the purview of section 202; therefore, the parties agree that, unless section 201 is declared unconstitutional, she will be barred from suit against respondent. Respondent and the friends of the court who intervene in the interests of political subdivisions deny that section 201 of the Act violates Article I, § 11 because, in their view, the General Assembly has merely "abolished" a cause of action which this Court has stated is a permissible legislative exercise under that provision.

On several occasions, this Court has espoused the view that nothing in Article I, § 11 prevents the legislature from extinguishing or modifying a cause of action. *Singer v. Sheppard*, 464 Pa. 387, 399–400, 346 A.2d 897 (1975); *Freezer Storage, Inc. v. Armstrong Cork Co.*, 476 Pa. 270, 279–81, 382 A.2d 715 (1978); *Jackman v. Rosenbaum Co.*, 263 Pa. 158, 168–69, 106 A. 238, aff'd. 260 U.S. 22, 43 S.Ct. 9, 67 L.Ed. 107 (1922); *Tsarnas v. Jones & Laughlin Steel Corp.*, 488 Pa. 513, 412 A.2d 1094 (1980); *Sherwood v. Elgart*, 383 Pa. 110, 117 A.2d 899 (1955). (Some of these cases have spoken of the authority of the legislature to "abolish" or "extinguish" a cause of action. None of these cases, however, dealt with legislation which extinguished a cause of action *in toto* leaving a plaintiff who had suffered a legal injury completely without any remedy. It is, therefore, doubtful whether the "abolition" language of these cases could support a total extinction of a cause of action without substituting some sort of remedy. For example, could the legislature abolish *all* causes of action for, say, the common law tort of trespass, leaving no viable, substitute remedy for injuries caused by *any* of the various types of trespass? I think not, despite the dicta to the contrary in the above cited cases. Or, could the legislature say "Because suits in assumpsit are a drain upon our judicial system, we hereby abolish all causes of action based upon breach of contract."? Again, such a sweeping "abolition" would probably not withstand the proscription of Article I, § 11.)

Article I, § 11 assures that every injured party will have redress for that injury so long as it retains its character as a

"legal injury". *Singer v. Sheppard, supra* 464 Pa. at 399, 346 A.2d at 903 citing *Jackman v. Rosenbaum Co., supra* 263 Pa. at 168, 106 A. 238. This "legal injury" qualification of the broad language of Article I, § 11 recognizes that no one has a "vested right in the continued existence of an immutable body of negligence law . . ." *Singer v. Sheppard, supra* 464 Pa. at 399, 346 A.2d at 903. Changing societal conditions occasionally require modification of some of the substantive elements or the procedural prerequisites of a particular cause of action. *See Freezer Storage, Inc. v. Armstrong Cork Co., supra* 476 Pa. at 280, 382 A.2d at 720, *and Jackman v. Rosenbaum Co., supra* 263 Pa. at 175, 106 A. at 244.

Hence, Article I, § 11 does not prohibit either the courts or the legislature from altering legal recognition of an injury. When societal interests and conditions have changed significantly, the cause of action based on such injury may be modified to keep pace. Thus, in *Sherwood v. Elgart*, 383 Pa. 110, 117 A.2d 899 (1955), this Court, with virtually no analysis of constitutional considerations, upheld a statute relieving from liability for lost or damaged personal property an innkeeper who provided a safe deposit facility for such personal property of his guests. The plaintiffs there had lost certain personal property in a hotel fire allegedly caused by the innkeeper's negligence and had contended that Article I, § 11 prohibited the legislature from "abolishing" the common law cause of action for recovery for the damage to their personal goods.

And in *Freezer Storage, Inc. v. Armstrong Cork Co., supra*, this Court upheld a similar challenge against a twelve year statute of repose for negligent defects and designs that would bar suit against builders and designers who had undertaken improvements to real property beyond that time period, but not against others who might have been considered to be improvers of real property, namely landowners and suppliers. Justice Roberts, speaking for the Court, wrote:

"If in *Sherwood* the Legislature could redefine the long-established rights of hotel guests and operators, we

should no less allow the Legislature to redefine the rights of builders, their customers and third parties, where those rights are not settled, but rather are in a period of growth and change.

This Court would encroach upon the Legislature's ability to guide the development of the law if we invalidated legislation simply because the rule enacted by the Legislature rejects some cause of action currently preferred by the courts. To do so would be to place certain rules of the "common law" and certain nonconstitutional decisions of courts above all change except by constitutional amendment. Such a result would offend our notion of the checks and balances between the various branches of government, and of the flexibility required for the healthy growth of the law." 476 Pa. at 280–81, 382 A.2d at 721. (emphasis added).

The legislature's ability to modify a cause of action consistent with Article I, § 11 is not, however, a *carte blanche.* There is a world of difference between the modification of a cause of action or the imposition of reasonable procedural prerequisites and the erection of insurmountable barriers to legal recognition of a cause of action. An immunity to liability is such a barrier.

We must pause a moment to reflect on the precedent of Article I, § 11. The rationale upholding constitutional challenges to statutes based on this section has been inconsistent,[3] strained,[4] or sometimes non-existent.[5] This should not

3. *Compare* the rationale of *Freezer Storage, supra with Tsarnas v. Jones & Laughlin Steel Corp.,* 488 Pa. 513, 412 A.2d 1094 (1980).

4. *Singer v. Sheppard, supra* is a good example of reasoning straining to fit within the constitutional parameters of Article I, § 11. (*See* lead opinion by Jones, C. J., 464 Pa. at 398–401, 346 A.2d at 899–907). Also note that no less than six separate opinions were written in *Singer.*

5. *Sherwood v. Elgart, supra* is often cited for the proposition that a common law cause of action can be abolished by act of legislature. *See, e. g., Freezer Storage Inc. v. Armstrong Cork Co., supra,* 476 Pa. at 279, 382 A.2d at 720–21. However, the *Sherwood* case was primarily a case of statutory construction; the only discussion of

be surprising—it can be extremely difficult in a given case to decide whether an act works a change on a substantive element or procedural requirement of a cause of action or is merely effecting a change of *result* by some artificial expedient. The distinction can be, and often is, hazy.[6] Reasonable men can differ.

Rather than straining to meticulously "distinguish" certain cases (which frequently leads to contortion of precedent), the better tack would seem to be the isolation of the common thread which binds (perhaps too loosely) the cases. That "thread" was identified by Justice Roberts in *Singer v. Sheppard, supra.* Justice Roberts observed, albeit in the context of Article III, § 18 (a section frequently argued side-by-side with Article I, § 11), that the Constitution does not "limit the power of the legislature to create or abolish causes of action;[7] to prescribe the essential elements of a cause of action; to specify what are recoverable items of damages or legally compensable losses; or to provide under what circumstances a person has a cause of action and what items of damage are recoverable by him in those circumstances." 464 Pa. at 415–16, 346 A.2d at 911–12.

This "thread" is the same one that runs, or should run, through the Article I, § 11 precedent. The cases represent attempts to reconcile the balance of powers between the judiciary and the legislature. Article I, § 11 represents a check on the legislature's powers to deny remedy for injuries done. Common sense—and precedent—indicate that the legislature *must* have *some* authority to modify existing causes of action, but that authority must be exercised *reasonably* and must not effectuate a complete denial of remedy for conduct which retains its character as "legal injury".

constitutional dimension was "the appellees may properly contend at this time that the Act of 1913 is unconstitutional [under Article I, § 11 and then applicable Article III, § 21]. However, after considering appellee's contention we find it to be without merit." 383 Pa. at 115, 117 A.2d 899.

6. *See* note 7 *supra.*

7. *But see* test *supra re caveat* on legislature's powers to "abolish" a cause of action, *supra.*

In the *Sherwood* (standard of care of negligence for damage to personal property modified for innkeepers who provide safe deposit facilities—in effect, legislatively determined that duty care was established when safe provided) and *Freezer Storage* (12 year statute of repose adopted—length of time between tortious conduct and commencement of action restricted for builders and designers) the Act of the General Assembly worked some change either on a substantive element of the cause of action or upon a procedural requirement which changes were reasonable exercises of legislative authority to modify a cause of action. These enactments were reasonable because they did not simply deny a remedy for an otherwise actionable injury. *See also Singer v. Sheppard, supra* (No-Fault Act abolished the common law tort of negligence for motor vehicle accident victims suffering personal injury damages under $750) and *Jackman v. Rosenbaum Co., supra* (common law tort for recovery for damages to party walls modified by statute—no recovery for consequential damages).

However, a barricade such as a grant of immunity stands in contrast to reasonable legislative modifications that have been sustained by this Court—the identity and status of the defendant are *in no way* elements or essential ingredients of the cause of action. An immunity does no more, *and no less*, than to close the door to suit for a particular cause of action against a favored defendant. "The immunity doctrine offends against fundamental justice and elementary logic in many ways . . . *it closes the doors to a person whose body has been injured . . . .*" *Flagiello v. Pennsylvania Hospital*, 417 Pa. 486, 506, 208 A.2d 193 (1965) (judicial abrogation of charitable immunity) (emphasis added).

In *Freezer Storage*, this Court approved the "rational distinction" between a statute of repose applicable to builders, engineers, architects and contractors but not to landowners or suppliers. The observations made in upholding the statute over an objection that it was "special legislation" prohibited by Article III, § 32 are equally cogent here. *Freezer Storage* held "[t]his Act . . . draws the sort of

rational distinction, *based on real differences* in the business world, which our cases have consistently upheld." 476 Pa. at 277, 382 A.2d at 719. The Court then reviewed a case, *Goodman v. Kennedy*, 459 Pa. 313, 329 A.2d 224 (1974), which sustained a portion of a statute exempting food stores with fewer than ten employees from Sunday "Blue Laws." *Goodman*, however, struck down another exemption for stores where certain commodities were sold by the store's proprietor or immediate family. The first exemption we held was rationally related to a legitimate legislative purpose but the "family" exemption "gave business benefits to certain individuals *solely* on the basis of family *status*. We did not see that this distinction had any basis in the business situation to which the statute applied." *Freezer Storage, Inc. v. Armstrong Cork Co., supra* 476 Pa. at 277, 382 A.2d at 719. *Freezer Storage* continued:

[I]n *Commonwealth v. Casey*, 231 Pa. 170, 80 A. 78 (1911), we struck down a law establishing a forty hour week for "mechanics, workingmen and laborers" employed by the state, municipalities or public works contractors, but not for laborers employed by private enterprise. This Court held that the distinction this statute drew between publicly and privately employed workers had *no relationship whatever to the type of work the employees performed* and therefore no relationship to the statutory aim of easing the burden of the workingman. That is, *the statute did not draw upon real distinctions* in the relevant business environment, the conditions in which the worker labors, *but upon the artificial grounds of the identity of the employer.*

*Id.,* 476 Pa. at 278, 382 A.2d at 719–20. (emphasis added).

Real distinctions versus artificial grounds. . . real modifications of causes of action versus artificial changes modifying nothing but result. The instructions of *Freezer Storage* regarding real and artificial distinctions are helpful to our determination. The legislature may not, under the guise of "modifying" a cause of action, simply carve two causes of action out of one on the basis of two classes of defendants,

and then "abolish" the cause of actions as to one of those classes. Such a dichotomy does not *in fact* just alter the cause of action or procedural requirement *or* the "legal" character of the injury. 'If injury is a "legal injury" when committed by X, it retains its character as a "legal injury" when committed by Y. The following examples are illustrative:

A. (1) negligent supervision of patient/inmate *by* private institution;

(2) negligent supervision of patient inmate *by* political subdivision.

B. (1) negligent use of firearms *by* private security guards;

(2) negligent use of firearms *by* political subdivision.

C. (1) negligent dumping of garbage *by* private contractors;

(2) negligent dumping of garbage *by* political subdivision.

With each of these types of torts, an action based on the second theory would be barred by section 201 of the Act as none of these examples fall within the eight enumerated exceptions to general immunity enunciated in section 202.[8] It cannot seriously be maintained that each of these examples illustrates two separate causes of action. The grant of immunity in section 201 does not, therefore, work *any* change in any heretofore recognized cause of action but, instead, plainly and simply denies access to the courts for the redress of a legal injury. The distinction between the asserted two causes of action is artificial.

Moreover, there is language in the Act which supports the conclusion that the Legislature did *not* purport, as amici suggest, to either abolish or modify causes of action. Sections 202 and 201 are, of course, in pari materia and must be construed together, if possible. The Statutory Construction Act of 1972, 1 Pa.C.S.A. § 1932 (supp. pamphlet 1980–81). Section 202(b) sets out the causes of action that the Act permits to be brought against the political subdivision. Sec-

8. *See* note 5, *supra.*

tion 202(a)(1) establishes a condition precedent to bringing an action for damages under 202(b), namely, that the "damage would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 201 . . . ." Thus, section 202(a)(1) implicitly recognizes that the *quality* of an injury as "legal" or "non-legal" is unaffected by the status of the parties or the existence of an immunity. If an act did not give rise to a cause of action at common law, section 202(b) does not create a new cause of action. This section, coupled with the fact that section 201 uses no language evincing an intention to affect causes of action, demonstrates that the legislature worked no change upon existing causes of action.

For the foregoing reasons, I would hold that the general grant of immunity in section 201 of the Act, 53 P.S. § 5311.201, denies access to the courts for redress for legal injury and clearly, palpably and plainly violates Article I, § 11 of the Pennsylvania Constitution. Accordingly, respondent's preliminary objections asserting governmental immunity should, on remand, be dismissed.

The majority opinion glosses over the complex issues in this case by the simple expedient of equating "political subdivisions" with "the Commonwealth." The majority hones in on the second proviso of Article I, § 11 ("suits may be brought *against the Commonwealth* in such manner and in such cases as the legislature may be law direct.") and, on *exceedingly* meager authority, concludes "[s]urely the Legislature's authority 'to choose cases in which the Commonwealth should be immune' encompasses political subdivisions." At 396. By use of this legal slight-of-hand, relying *only* on a case which states that municipal corporations are agents of the state, *City of Pittsburgh v. Commonwealth*, 468 Pa. 174, 360 A.2d 607 (1976), the majority concludes that "the conferring of tort immunity upon political subdivisions is within the scope of the legislature's authority pursuant to Article I, Section 11." At p. 396.

The second sentence in Article I, § 11 provides: "Suits may be brought *against the Commonwealth* in such manner, in such courts and in such cases as the legislature may by law direct." (emphasis added); it does *not say* "suits may be brought against the Commonwealth *and its subdivisions,* etc." It is quite obvious that this proviso is *irrelevant* to the instant case. Whatever authority this proviso may grant to the General Assembly to enact legislation conferring immunity upon the Commonwealth (*see Mayle v. Pennsylvania Dept. of Highways,* 479 Pa. 384, 388 A.2d 709 (1978)), it has no bearing on the authority of the General Assembly to confer immunity upon political subdivisions.

A political subdivision is most certainly not "the Commonwealth" and the parties do not seriously argue that the second proviso of Article I, § 11 supports the legislature's enactment of the Act. Such an argument is quickly answered with two same-day decisions of this Court. *Brown v. Commonwealth,* 453 Pa. 566, 305 A.2d 868 (1973) declined to overrule the "doctrine" of sovereign immunity in the absence of legislative action waiving the Commonwealth's immunity. *Ayala v. Philadelphia Board of Public Education, supra,* did not feel compelled, on the other hand, to await legislative action in order to abolish immunity's local government counterpart. The difference between these cases, as observed by Justice Pomeroy, was the second proviso, which provided a constitutional basis for sovereign immunity but not for governmental, thus freeing the courts to act in the latter case, while restricting them in the former. *Brown v. Commonwealth, supra,* 453 Pa. at 573–74, 305 A.2d at 872–74 (Pomeroy, J., concurring). Justice Roberts reiterated this theme in *Ayala* wherein he stated:

> The notion that the immunity of the school district is linked to the sovereign immunity of the Commonwealth and that, therefore, only the Legislature may act, is a notion without present vitality. Underlying this assumption is the theory that there is a distinction between municipal corporations and quasi-corporations, the latter being agents of the Commonwealth and, thus, entitled to

the sovereign immunity enjoyed by the Commonwealth
. . . .

We expressly rejected this theory in *Morris v. Mount
Lebanon Township School District.* [393 Pa.] [633] at 636,
144 A.2d [737] at 738 . . . .

Thus, municipal corporations and quasi-corporations are
on an equal level with regard to immunity. The immunity
of both these types of governmental units was judicially
created and may be judicially abolished. *Whatever may
be the need for legislative action in the area of sovereign
immunity, it is clear that there is no requirement for
legislative action to abolish—as we do here—the immunity
of municipal corporations and quasi-corporations.*

453 Pa. at 601 n.8, 305 A.2d at 885 n.8. (emphasis added).

Because I would decide the grant of immunity of section
201 violates Article I, § 11, there is no need to resolve the
equal protection issue. I would note, however, that *serious*
equal protection problems are raised by legislative classifica-
tion based *solely* on the identity and/or status of one of the
parties. At this Court's recent decisions have uniformly and
unequivocally stressed, there are *"no reasons whatsoever"*
for immunities that are strictly status-based. *Ayala v.
Philadelphia Board of Public Education, supra,* 453 Pa. at
592, 305 A.2d 877 (1973) (emphasis added). We further
stated in *Ayala,* per Justice Roberts, "we must agree with
Chief Justice Traynor of the California Supreme Court that
'the rule of governmental immunity is an anachronism,
*without rational basis . . . .'"* *Id.,* 453 Pa. at 592, 305 A.2d
877.[9]   Cf. *Dubree v. Commonwealth,* 481 Pa. 540, 393 A.2d

9. Thus, even under the traditional "rational basis" test (i. e., whether
a classification is reasonable, not arbitrary, and rests upon a differ-
ence having a fair and substantial relation to a legitimate legislative
purpose. *See Moyer v. Phillips,* 462 Pa. 395, 341 A.2d 441 (1971) *and
Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 331
A.2d 198 (1975)) a classification based *solely* on status is in a grave
constitutional predicament. An argument might, moreover, be legiti-
mately advanced that the standard of review of this legislation
should be "strict scrutiny", *Baltimore & Ohio Railroad Co. v. Com-
monwealth Dep't of Labor and Industry,* 461 Pa. 68, 83 n.11, 334 A.2d
636 n.11 (1975), as "it is fundamental to our common law system
that one may seek redress for every substantial wrong." *Ayala v.*

293 (1978) wherein the doctrine of official immunity was upheld but was restricted to cases where the public policy (of ensuring that an official will exercise his judgment unhampered by the threat of personal liability) will be served. That is, automatic immunity was disapproved, while immunity on a case-by-case basis, looking to the *function* performed by the official (the nature of the official's action or decision in question) and the need for immunity to ensure the continued diligent and unfettered performance of that function, was retained. *Also cf. Petition of Dwyer*, 486 Pa. 585, 406 A.2d 1355 (1979) (quasi-judicial immunity from criminal prosecution for certain public officials adopted where performance of duties require unfettered discretion in rendering quasi-judicial decisions) *and* Restatement Second of Torts, Ch. 45 A, *especially* §§ 895C and 895D and comments thereto.

FLAHERTY and KAUFFMAN, JJ., join in this dissenting opinion.

KAUFFMAN, Justice, dissenting.

The majority not only has breathed new life into an antiquated doctrine, but also has erroneously given it constitutional underpinnings. This result is contrary to law, logic, and fundamental justice.

In 1973, this Court abolished governmental immunity with respect to municipal corporations and political subdivisions. *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877 (1973). Mr. Justice Roberts persuasively wrote in that case:

> [C]ities and states are active and virile creatures capable of inflicting great harm, and their civil liability should be co-extensive. Even though a governmental entity does not profit from its projects, the taxpaying public nevertheless does, and it is the taxpaying public which should pay for governmental maladministration. If the city op-

*Philadelphia Board of Public Education, supra* 453 Pa. at 594, 305 A.2d 877 quoting *Niederman v. Brodsky*, 436 Pa. 401, 403, 261 A.2d 84, 85 (1970).

> erates or maintains injury-inducing activities or conditions, the harm thus caused should be viewed as a part of the normal and proper costs of administration.... *The city is a far better loss-distributing agency than the innocent and injured victim.*

*Id.,* 453 Pa. at 594–95, 305 A.2d at 882 (Emphasis supplied). Just recently, we abrogated sovereign immunity with respect to the Commonwealth, concluding that the doctrine irrationally placed a victim's opportunity for justice "not upon the nature of his injury or of the act which caused it, but upon the identity or status of the wrongdoer." *Mayle v. Pennsylvania Department of Highways,* 479 Pa. 384, 386, 388 A.2d 709, 710 (1978). *See also Falco v. Pados,* 444 Pa. 372, 282 A.2d 351 (1971) (abolishing parental immunity); *Flagiello v. Pennsylvania Hospital,* 417 Pa. 486, 208 A.2d 193 (1965) (abolishing charitable immunity).

These decisions clearly reflect one of the most basic and fundamental concepts of our common law: "one may seek redress for every substantial wrong." *Sinn v. Burd,* 486 Pa. 146, 155, 404 A.2d 672, 677 (1979); *Niederman v. Brodsky,* 436 Pa. 401, 403, 261 A.2d 84, 85 (1970). Contrary to recent trends in Pennsylvania law, however, the majority concludes that Article 1, Section 11 of our Constitution, which expressly refers only to the *Commonwealth,* vests the Legislature with authority to immunize *political subdivisions* from suit.[1] Whatever authority this section might give the Legislature to insulate the *Commonwealth,* our decisions clearly establish that it does not extend to political subdivisions. On the very same day that this Court decided *Ayala,* we upheld the doctrine of sovereign immunity *as applied to the Commonwealth* upon the assumption that such immunity was *constitutionally mandated* by Article 1, Section 11 and could only be waived by the Legislature. *See Brown v. Common-*

---

1. The second sentence of Article 1, Section 11 provides: "Suits may be brought against the *Commonwealth* in such manner and in such cases as the Legislature may by law direct." Pa.Const. art. 1, § 11. (Emphasis supplied).

*wealth*, 453 Pa. 566, 571, 305 A.2d 868, 870 (1973).[2] Never-theless, in abrogating governmental immunity for political subdivisions in *Ayala*, we found no such constitutional re-straint:

> The notion that the immunity of the school district is linked to the sovereign immunity of the Common-wealth . . . is a notion without present vitality . . . .
>
> . . . . Whatever may be the need for legislative action in the area of sovereign immunity, it is clear that there is no requirement for legislative action to abolish—as we do here—the immunity of municipal corporations and quasi-corporations.

*Ayala v. Philadelphia Board of Public Education, supra* 453 Pa. at 601 n.8, 305 A.2d at 885 n.8. Thus, when read together, *Ayala* and *Brown* squarely refute the majority's reasoning that the reference to the "Commonwealth" in Article 1, Section 11 also includes political subdivisions.

Moreover, Mr. Justice Roberts' dissent in *Laughner v. Allegheny County*, 436 Pa. 572, 261 A.2d 607 (1970) demon-strates the anomalous and inconsistent result which the majority reaches today. In *Laughner*, which we decided prior to *Ayala*, the majority *per curiam* affirmed the dis-missal of a wrongful death action instituted against Alleghe-ny County on facts strikingly similar to those now before us. In his dissent, Mr. Justice Roberts wrote that governmental immunity is distinguishable from sovereign immunity in that the latter applies solely to suits against the Common-wealth and is expressly created by our Constitution. Urging this Court to abolish governmental immunity, Mr. Justice Roberts concluded:

> The county was under a duty to provide for Carol's care, yet we sanction the negligent way in which they provide that care. We refuse to use the historical tool at our disposal—tort law—to help prevent future abuses. Those

2. We later concluded in *Mayle* that Article 1, Section 11 was neutral with respect to sovereign immunity, and thus did not preclude us from abolishing the judicially imposed doctrine even as to the Com-monwealth.

who must accept the 'benefits' of governmental action will continue to be faced with what Carol faced. And governmental units will be secure in their knowledge that they may act with impunity.

436 Pa. at 575, 261 A.2d at 608–09 (Roberts, J., dissenting).

Thus, there is no constitutional or rational basis for permitting the Political Subdivision Tort Claims Act ("Tort Claims Act") to shield York County from potential liability for its alleged wrongs. We must not ignore the plain meaning of the first sentence of Article 1, Section 11:

All Courts shall be open, and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay.

The immunity which the Tort Claims Act affords, and which the majority upholds, is not only manifestly unjust and inconsistent with our most recent decisions, but unconstitutionally slams shut the doors of our courts solely on the basis of the county's status as an arm of the Commonwealth.

While we have recognized the Legislature's authority to define, within constitutional parameters, what constitutes a "legal injury," *Singer v. Sheppard*, 464 Pa. 387, 400, 346 A.2d 897, 903 (1975), the Tort Claims Act does not purport to modify or alter existing causes of action. Rather, it unconstitutionally denies victims not falling within any of its exceptions a "remedy by due course of law." The majority's resurrection of governmental immunity is a giant leap backwards denying substantial justice to countless innocent and injured victims of this Commonwealth.[3]

---

**3.** As Justice Musmanno has stated:

I would like to see this honored Court...take the lead and be in the vanguard rather than in the rear ranks of the forces battling to overcome outmoded reasoning, unrealistic precedents, mechanical adherence to illogical rules, and doctrines which have no place in the twentieth century of a greater appreciation of the sanctity of human life and all that life holds dear.

*Knaub v. Gotwalt*, 422 Pa. 267, 282, 220 A.2d 646, 653 (1966) (Musmanno, J., dissenting).

Accordingly, I would hold that plaintiff may proceed with her cause of action against the County of York.

LARSEN and FLAHERTY, JJ., join in this dissenting opinion.